**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **ANTONIO TERREL PEWITTE,** | ) | |
| | ) | |
| **Petitioner,** | ) | **No. 3:20-cv-00010** |
| | ) | |
| **v.** | ) | **JUDGE TRAUGER** |
| | ) | |
| **WARDEN RUSSELL WASHBURN,** | ) | |
| | ) | |
| **Respondent** | ) | |

## <u>MEMORANDUM OPINION</u>

Antonio Pewitte, a convicted prisoner in state custody, filed a petition for the writ of habeas corpus under 28 U.S.C. § 2254 and paid the filing fee. (Doc. Nos. 1, 4.)  The court will deny the petition for the reasons explained below.

### I.  FACTS AND PROCEDURAL HISTORY

A Davidson County jury convicted the petitioner in 2015 of one count of aggravated child neglect resulting in serious bodily injury. (Doc. No. 10-1 at 7, 82.)  He had also been charged with three other counts of which he was acquitted—one count of aggravated child abuse resulting in serious bodily injury, one count of aggravated child abuse by use of a dangerous instrumentality, and one count of aggravated child neglect by use of a dangerous instrumentality—all as alternative theories of criminality for scalding his girlfriend's six-year-old daughter's hands in hot water. (Doc. No. 10-13 at 2.)

At the time of the incident, the petitioner had been dating the victim's mother for almost three years and lived with her, the victim, her son M.O., and the petitioner's son. (*Id.*)  The Tennessee Court of Criminal Appeals summarized the evidence at trial:

> On the evening of December 1, 2013, Mother was at work, and Defendant was watching her children. Before dinner, N.C. went into the bathroom next to the kitchen and began washing her hands with cold water. Defendant and the other

children were at the kitchen table waiting on N.C. to finish washing her hands so that they could begin eating together. Defendant joined N.C. in the bathroom and turned the faucet handle to hot water. Defendant then "grabbed" her wrists and put her hands under the hot water so that the water ran over the back of her hands and thumbs. N.C. testified that the hot water was "painful" and that she cried when she felt it. N.C. said that Defendant did not apply soap to her hands or rub her hands together while her hands were under the water. According to N.C., Defendant also "tried to put [her] face in the water."

N.C. thought that Defendant changed the water temperature because she was "taking too long," and she thought he was "angry." N.C. also testified that, prior to the incident, Defendant believed that N.C. was "messing with nail polish," so he punished her by making her "stand in the corner with one leg up and one leg down" while raising both of her hands to her head. N.C. thought that Defendant put her hands under the hot water on purpose and that it was not an accident.

Afterward, Defendant told N.C. to go sit down at the kitchen table, and she complied. During dinner, N.C.'s hands hurt and made it difficult for her to use her fork. Throughout the night, N.C. had trouble sleeping because her hands hurt.

M.O., who was twelve years old at the time of trial, testified that he was at the kitchen table and heard N.C. scream after Defendant went into the bathroom with her. M.O. saw that N.C.'s hands were red, but he did not recall Defendant doing anything to help treat N.C.'s hands. M.O. also heard N.C. "moaning" before she went to bed.

While Mother was at work, she talked with Defendant on the phone around half a dozen times. He told her that N.C. was playing with her nail polish and said that he was going to let Mother "handle it" when she got home. According to Mother, Defendant sounded "angry." On one of the phone calls, Defendant made N.C. tell Mother that she was in trouble because she "lied" about playing with the nail polish. Mother testified that she did not believe her daughter lied about the nail polish because N.C. was crying on the phone. Although they spoke on the phone numerous times, Defendant never called Mother to tell her that N.C.'s hands were burned, and he did not mention the incident to Mother when she returned home from work. Mother's shift ended at 11 p.m. When she got home, she fell asleep on the couch in the living room.

The following morning, N.C. awakened Mother and said that her hands hurt. Mother observed that there were blisters on the front and back of N.C.'s hands. The blisters covered "most" of her hands. Mother was "shocked" and "worried." Mother woke up Defendant and asked him what happened.

Given the nature of the injuries, Mother thought that N.C. needed to go to the hospital, but Defendant disagreed. Defendant told Mother that she was "stupid" and said that N.C. "didn't need to go to no f***ing hospital." Then, Defendant soaked N.C.'s hands in rubbing alcohol and tried to "pop" the blisters with a safety pin. Mother went to the store and bought gauze wrap and Neosporin cream. She used both to treat N.C.'s hands.

Mother called her mother, Carla Agins, and told her about what happened. After learning that N.C.'s hands were burned, Ms. Agins called 911 and the hotline for the Department of Children's Services. According to Ms. Agins, Mother seemed scared because she was whispering on the phone.

Detective Jeffrey Gibson of the Nashville Police Department went to the house and inspected the bathroom where the incident occurred. When Detective Gibson arrived, Defendant was cooperative and seemed "visibly upset." The sink's faucet had a single lever which turned back and forth horizontally to change the water temperature. Detective Gibson turned on the hot water as high as it would go and then he used a digital thermometer to check the temperature of the water over a period of about two minutes. The temperature of the water fluctuated, but the highest reading was 141.6 degrees Fahrenheit, and the most consistent temperature reading was around 131.6 degrees Fahrenheit. When Detective Gibson checked the water temperature with an analog thermometer, it reached almost 130 degrees Fahrenheit. While the water was running, steam would come from the water intermittently.

After checking the hot water heater, Detective Gibson discovered that the temperature control dial was on the setting just below the hottest. The hot water heater was located next to the bathroom, so the water would not have had to travel far before reaching the bathroom faucet. Mother testified that she had not adjusted the hot water heater temperature settings. She was not aware that anyone had previously been burned by the hot water in their home. The house in which they lived was government-owned housing, so the tenants did not handle maintenance issues.

An ambulance took N.C. to the hospital, where she remained for six days, during which she received aqua therapy and had to perform exercises "to keep flexibility in her hands." N.C. stayed on pain medication throughout the hospitalization. Mother had to change N.C.'s bandages twice a day after N.C. was discharged, and N.C. had to continue doing flexibility exercises for two months.

Carrie Donnell was a nurse practitioner at Vanderbilt University Medical Center who evaluated N.C. in the emergency department on the day after the incident. The trial court certified her as an expert in child abuse pediatrics without objection. Ms. Donnell described N.C.'s injuries as a mix of superficial thickness burns and partial thickness burns located on "the palm and the back of her hand and then extended from her wrist down to her fingers" on each hand. Ms. Donnell explained:

> [B]urns are described ... on a continuum being partial thickness to full thickness burns. And within partial thickness, you can have superficial and deep partial thickness burns. So, if you think about a superficial burn, it would be like a sunburn, redness to the skin, but no loss of skin. And then, as the burn progresses and gets ... deeper, you will have blistering and loss of skin. In a full thickness burn, [it] would enter into subcutaneous tissue and even bone.

3

The majority of N.C.'s burns were partial thickness burns, including deep partial thickness burns on both hands. Ms. Donnell explained that "superficial and partial thickness burns are actually more painful than full thickness burns ... because the nerve endings are exposed but not yet killed off, ... and the full thickness burns are so deep that the nerve endings are just completely [gone], ... so you don't actually feel that sensation anymore." Because N.C.'s burns were of the former type, they required "ongoing pain management" until they healed.

After N.C. sustained the injuries, "her hands would have been obviously very red. While they might not have been blistered immediately upon burn—that would have developed over some time—but it would have been clear to any prudent caregiver that she had been injured." Ms. Donnell explained that immediate medical attention is "very important" for a child with such injuries in order to reduce the risk of developing "difficulty in flexing that extremity or body part." Ms. Donnell testified that popping the blisters and applying burn ointment was not "an appropriate form of medical intervention" for N.C.'s injuries because opening a wound increases the risk of infection. N.C.'s injuries caused loss of pigmentation to her skin and also reduced the range of motion in her hands.

Ms. Donnell testified that the burns on N.C.'s hands were consistent with both hands having been placed "perpendicular to the floor" with the thumbs upwards underneath the hot water. According to Ms. Donnell, a child can comfortably wash in hot water with a temperature of about 101 degrees, and burns can begin forming at 113 degrees with prolonged exposure. A child like N.C. would be expected to cry out in pain and withdraw from 113–degree water. Accordingly, N.C.'s injuries were not accidentally self-inflicted. N.C.'s burns required "increased temperature and increased exposure time" beyond that of quick contact with 113–degree water. Ms. Donnell testified that, in water of 130 degrees Fahrenheit, it would take approximately six to ten seconds for a child to sustain the injuries that N.C. did. A full thickness burn would result after approximately one second from a child's exposure to water of 140 degrees Fahrenheit.

(Doc. No. 10-13 at 2–5.)

The petitioner did not testify at trial. (*Id.* at 5.) The trial court sentenced him to 20 years in prison with eligibility for release after serving 70% of his sentence. (Doc. No. 10-1 at 95.) The Tennessee Court of Criminal Appeals affirmed the conviction and sentence on direct appeal, and the Tennessee Supreme Court denied review. (Doc. Nos. 10-13, 10-18.) The petitioner then sought relief through post-conviction proceedings, which the trial court denied after an evidentiary hearing. (Doc. No. 10-19 at 49–58.) The Tennessee Court of Criminal Appeals affirmed the denial of relief, and the Tennessee Supreme Court again denied review. (Doc. Nos.

10-24, 10-27.)

The petitioner filed his pending habeas petition in January 2020, and the respondent acknowledges that it is timely and that it is the petitioner's first such petition. (Doc. No. 12 at 1.)

## II.    ISSUES PRESENTED FOR REVIEW

The petition raises the following claims for relief:

1. The trial court erred in failing to require the state to make an election of offenses. (Doc. No. 1 at 16.)

2. The trial court erred by admitting hearsay evidence. (*Id.*)

3. Trial counsel was ineffective for failing to present a plumbing expert at trial. (*Id.* at 17.)

4. The prosecution's closing argument amounted to a constructive amendment of the indictment and violated the petitioner's right to a fair trial. (*Id.* at 18.)  And

5. The cumulative effect of these errors denied the petitioner a fundamentally fair trial. (*Id.* at 20.)

## III.    STANDARD OF REVIEW

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Peterson v. Warren*, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and

5

federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). AEDPA's requirements "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). Where state courts have ruled on a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

Specifically, a federal court may not grant habeas relief on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (d)(2). A state court's legal decision is "contrary to" clearly established federal law under § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. An "unreasonable application" occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A state court decision is not unreasonable under this standard simply because the federal court finds it

6

erroneous or incorrect. *Id.* at 411. Rather, the federal court must determine that the state court's decision applies federal law in an objectively unreasonable manner. *Id.* at 410–12.

Similarly, a district court on habeas review may not find a state court factual determination to be unreasonable under Section 2254(d)(2) simply because it disagrees with the determination; the determination must be "'objectively unreasonable' in light of the evidence presented in the state court proceedings." *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). "A state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007) (quoting § 2254(d)(2) and (e)(1)); *but see McMullan v. Booker*, 761 F.3d 662, 670 & n.3 (6th Cir. 2014) (observing that the Supreme Court has not clarified the relationship between (d)(2) and (e)(1) and the panel did not read *Matthews* to take a clear position on a circuit split about whether clear and convincing rebutting evidence is required for a petitioner to survive (d)(2)). Moreover, under Section 2254(d)(2), "it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).

Thus the standard set forth in 28 U.S.C. § 2254(d) for granting relief on a claim rejected on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Richter*, 562 U.S. at 102, and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). Petitioner carries the burden of proof. *Pinholster*, 563 U.S. at 181.

Even that demanding review, however, is ordinarily only available to state inmates who have fully exhausted their remedies in the state court system. 28 U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has presented the same claim sought to be redressed in a federal habeas court to the state courts. *Pinholster*, 563 U.S. at 182. This rule has been interpreted by the Supreme Court as one of total exhaustion. *Rose v. Lundy*, 455 U.S. 509 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *Picard v. Connor*, 404 U.S. 270 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (explaining that exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). Moreover, the substance of the claim must have been presented as a federal constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996).

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977); *see also Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment."); *Coleman v. Thompson*, 501 U.S. 722 (1991) (same). If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim), then the claim is technically

8

exhausted, but procedurally barred. *Id*. at 731–32.

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman*, 501 U.S. at 754). "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him [;] . . . some objective factor external to the defense [that] impeded . . . efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753 (emphasis in original). Examples of cause include the unavailability of the factual or legal basis for a claim or interference by officials that makes compliance "impracticable." *Id.* To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)); *see also Ambrose v. Booker*, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause, petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392

(2004) (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)); *accord Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006).

## IV.    ANALYSIS

**A.    Election of Offenses**

The state charged the petitioner in a four-count indictment reflecting two different theories each of aggravated child abuse and aggravated child neglect: (1) abuse and/or neglect resulting in serious bodily injury; and (2) abuse and/or neglect inflicted with a "dangerous instrumentality"—scalding water. (Doc. No. 10–1 at 4–8.)    The jury convicted him only on Count 3, aggravated child neglect resulting in serious bodily injury, and acquitted him on the other three counts. (*Id.* at 7, 82–85.)    The petitioner claims that the state should have been required "to make an election of offenses to distinguish the separate counts of child abuse and child neglect based upon spatial and factual differences of each count" and that the failure to require such election meant that he was subject to "multiple punishments" for a "criminal episode [that] constituted but a single offense."(Doc. No. 1 at 16.)    He complains of "multiplicity" in the indictment. (*Id.*)    The court understands this claim to assert that the failure to require an election of offenses violated the petitioner's rights under the Fifth Amendment's Double Jeopardy Clause.

The petitioner claimed on direct appeal that "the trial court erred in failing to require the state to make an election of offenses for each count charged in the indictment." (Doc. No. 10-10 at 11.)    The petitioner's brief mentioned only in passing that one of the purposes of an election of offenses is "to protect the defendant against double jeopardy":

> Where a defendant commits multiple offenses against a victim, the state has a duty to elect which act or occurrence relates to which particular charged offense for which the State seeks a conviction. *State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000).    The purposes of election are: 1) to ensure the defendant is able to prepare

for and defend a specific charge; 2) to protect the defendant against double jeopardy; 3) to allow the trial and appellate courts to review the legal sufficiency of the evidence; and 4) most importantly, to ensure that the jurors deliberate over and render a verdict on the same offense, which is a fundamental constitutional right of an accused. *Id.*

(*Id.* at 33.) But his chief argument in support of his claim on direct appeal was that the failure to require an election violated his "right to a unanimous jury verdict under the Tennessee Constitution." (*Id.* at 32–33.) Specifically, he asserted that "some jurors may have found that the defendant's negligent act was putting the victim's hands under the hot water; other jurors may have determined that the defendant's negligent act was failing to seek appropriate medical treatment for her injuries." (*Id.* at 36 (citations omitted).)

The Tennessee Court of Criminal Appeals rejected this claim on its merits in an analysis that focused solely on the state constitutional claim about unanimity of the jury verdict:

> Defendant argues that his right to a unanimous jury verdict was violated when the trial court refused to require the State to elect which offense it was prosecuting under each count of the indictment. He maintains that the jury's guilty verdict for aggravated child neglect could have been based on either his conduct in holding the victim's hands under hot water or his conduct in failing to seek prompt medical assistance for the victim. The State argues that no election was required because Defendant's continuing course of conduct was a single offense. We agree with the State.

> A criminal defendant's constitutional right to a jury trial includes the right to a unanimous jury verdict. *See State v. Lemacks*, 996 S.W.2d 166, 169–70 (Tenn. 1999). "[W]here the prosecution presents evidence to the jury that tends to show more than one criminal offense, but the underlying indictment is not specific as to the offense for which the accused is being tried," the trial court must require the State to elect which offense it is submitting for the jury's consideration. *Id.* at 170. The purpose of the election requirement is to prevent "patchwork" verdicts, wherein some of the jury base their decision on one offense, while others base their decision on another offense. *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993). Accordingly, no election is necessary where there is only evidence of a single offense. *State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000).

> In *Adams*, our supreme court declared that child neglect may be a single, "continuing course of knowing conduct beginning with the first act or omission that causes adverse effects to a child's health or welfare" and continuing "until the person responsible for the neglect takes reasonable steps to remedy the adverse

effects to the child's health and welfare caused by the neglect." *Id.* at 296. Although not always the case, "a continuing offense may be composed of multiple discrete acts where a single scheme or motivation is present." *Id.*

In this case, the conduct for which Defendant was prosecuted and convicted was a continuing course of conduct which began when he caused the victim's hands to be burned by holding them under hot water and continued for as long as he failed to properly attend to her injuries. [FN2: Indeed, the jury instructions informed the jury as much: "'Neglect' is a continuing course of conduct beginning with the first act or omission that causes adverse effects to a child's health and welfare and can be an act of commission or omission. Neglect also includes a failure to provide or seek appropriate medical care."] This remains true even though the course of conduct was composed of more than one discrete act. While failure to seek medical care, in some cases, may constitute the entirety of the allegedly criminal conduct for a charge of neglect, we do not believe that it necessarily follows that an election of offenses is required anytime a period of failure to seek medical care accompanies other discrete conduct which more directly contributes to the infliction of injury. Under these circumstances, there was no need for an election of offenses because the neglect charges were predicated upon a single, continuing course of conduct, and therefore, the evidence only suggested a single criminal offense of neglect. Defendant is not entitled to relief on this basis.

(Doc. No. 10-13 at 5–6.)

The court concludes that petitioner's fleeting reference to double jeopardy in his state-court brief, which the state court did not treat as part of the substance of his claim, did not fairly present any federal double jeopardy claim to the state court for review. *Adams*, the state court opinion the petitioner cited for his general basis for the requirement to elect offenses, does not cite or discuss the federal constitution or any federal constitutional rights. 24 S.W.3d 289. It cites a single federal opinion, *Toussie v. United States*, 397 U.S. 112, 115 (1970)), simply as a secondary citation on the topic of when a crime is a continuing offense. *Adams*, 24 S.W.3d at 295. *Toussie* does not involve double jeopardy, and *Adams* mentions double jeopardy only once, as the second basis for the election requirement: "Second, election protects a defendant against double jeopardy by prohibiting retrial on the same specific charge." *Adams*, 24 S.W.3d at 294. Accordingly, the petitioner's oblique reference to "double jeopardy" is simply not sufficient to put a state court on notice of any federal constitutional claim. *See McMeans v. Brigano*, 228 F.3d

674, 682 (6th Cir. 2000) (holding that references to broad constitutional concepts like "fair trial" and "due process" do not fairly present a specific constitutional claim). It clearly did not do so in this case.

The petitioner is now barred from presenting any federal double jeopardy claim to the state courts by Tennessee Rule of Appellate Procedure 4, the statute of limitations imposed by Tennessee Code Annotated § 40-30-102(a), and the "one petition" limitation of Section 40-30-102(c). Accordingly, any federal double jeopardy claim raised here is procedurally defaulted and not subject to federal habeas review.

Alternatively, even if the petitioner's reference to double jeopardy fairly presented his claim such that the state court is presumed to have rejected it on the merits without discussion, *see Harrington v. Richter*, 562 U.S. 86, 99 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."), the claim would fail in this court as well. The Fifth Amendment's Double Jeopardy Clause provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. "The prohibition . . . protects individuals not only from successive trials, but also prohibits multiple punishments for the same offense." *United States v. DeCarlo*, 434 F.3d 447, 454 (6th Cir. 2006) (citing *Witte v. United States*, 515 U.S. 389, 391 (1995)). The petitioner was subjected to only one trial resulting in only one punishment for a single count of conviction, and he does not cite any clearly established precedent establishing that the Double Jeopardy Clause was violated in this case. He is not entitled to relief on this claim.

13

**B.      Hearsay**

The petitioner alleges that the trial court relieved the state of its burden of proof at trial by admitting hearsay testimony from Carrie Donnell, in violation of his right to due process under the Fourteenth Amendment. (Doc. No. 1 at 16–17.)  He raised the admissibility of this hearsay on appeal, and the Tennessee Court of Criminal Appeals denied relief:

> Defendant argues that the trial court erred by admitting into evidence statements made by the victim to the nurse practitioner at the hospital. Defendant maintains that the statements were procured for the purpose of facilitating criminal prosecution rather than for medical diagnosis and treatment. The State disagrees.

> Tennessee Rule of Evidence 803(4) allows for the admission of hearsay in the form of statements for the purposes of medical diagnosis or treatment. The rule requires either that (1) the statement must have been made for the purposes of diagnosis and treatment, in effect describing medical history, past or present symptoms, or pain or sensations, or (2) the statement must address the cause or source of the problem if reasonably pertinent to diagnosis and treatment. *State v. McLeod*, 937 S.W.2d 867, 870 (Tenn. 1996). This hearsay exception is justified because "the declarant's motive of obtaining improved health increases the statement's reliability and trustworthiness." *State v. Barone*, 852 S.W.2d 216, 220 (Tenn. 1993). In addition, "if physicians or other medical personnel rely upon the statement in diagnosing and treating the patient, then the statement should be sufficiently trustworthy to be admissible in a court of law." *McLeod*, 937 S.W.2d at 870 (citing *Barone*, 852 S.W.2d at 220; *State v. Edwards*, 868 S.W.2d 682, 699 (Tenn. Crim. App. 1993)).

> In order to determine the admissibility of a statement made by a child-declarant pursuant to Rule 803(4), the trial court is required to conduct an evidentiary hearing outside the jury's presence. *Id.* at 869. When determining whether a child's statement qualifies for a hearsay exception under Rule 803(4), the trial court "must consider criteria such as the circumstances surrounding the making of the statement," including "the timing of the statement and its contents," whether "the statement was inappropriately influenced by another," whether the statement "was in response to suggestive or leading questions," and whether there were any other factors that might "affect trustworthiness, such as a bitter custody battle or family feud." *Id.* at 871.

> Ms. Donnell was employed by Vanderbilt University Hospital and worked in their Child Abuse Response and Evaluation ("CARE") Team. The CARE Team is called in to evaluate injuries possibly caused by child abuse or neglect. Ms. Donnell and her team act as a liaison with the Department of Children Services

14

and law enforcement officers when necessary. The CARE Team works on over 200 cases each year, and Ms. Donnell handles about a third of those cases. In every case, Ms. Donnell takes a medical history from the child, if able to speak, as well as the caregiver. The medical history includes questions about the source of and the circumstances surrounding an injury because that information is useful in formulating a medical diagnosis and recommendations for treatment. Medical professionals also use this information to ensure that a child will not be released back into an environment where the injury may occur again. Knowledge of previous injuries or a history of domestic violence against a patient would be utilized by any medical professional in diagnosing and treating an injury. In her capacity, Ms. Donnell does not actually provide treatment to patients, but she makes treatment recommendations to the attending physician. Ms. Donnell testified, "The purpose of my evaluation is strictly medical. It has an investigative value, but we are not investigators . . . ."

At trial, the prosecutor asked Ms. Donnell to read the medical history portion of her medical record for N.C. Ms. Donnell conveyed the following:

> I first met with [N.C.] at the bedside who reports that last night she was washing her hands in the bathroom before dinner and that her mother's boyfriend, who she refers to as daddy, purportedly told her to "hurry up and wash her hands." When I asked how she hurt her hands, she states, "My daddy put them under hot water." When asked why she thinks he did that, she states, "I was going slow, washing, and then he came in and put it on hot water." She reports that he was "mad" when he did this "because he is tired of me because I didn't hurry up and wash my hands." When asked what . . . the temperature was when she first went in the bathroom to wash her hands, she states, "I put it on cold water first." She states that, after he turned the water to hot, "He put my hands under hot water." She reports that she pulled her hands out of the water. She reports that she did not say anything at the time but states, "My hands were red. It hurt." When asked if her father said anything to her after that, she states, "He told me to sit down."

Later, Ms. Donnell testified that N.C. told her that she had been placed in a corner as a form of discipline. She also related what she learned about the incident from Mother. Mother told her that N.C.'s hands looked like "water balloons" and that N.C. appeared to be in pain. Mother also explained what she and Defendant did to treat the burns and told Ms. Donnell that she called her mother about the incident.

Defendant relies on *State v. Cannon*, 254 S.W.3d 287, 304-05 (Tenn. 2008), where our supreme court held that statements made by a patient to a sexual assault nurse examiner violated the Confrontation Clause. However, that case is factually distinguishable from this case, and the court only conducted a Confrontation Clause analysis—it did not discuss whether the victim's statements satisfied the hearsay exception under Rule 803(4).

Our courts have routinely applied this hearsay exception to statements of victims

15

provided in response to questions about how an injury was inflicted. *See*, *e.g.*, *State v. Parker*, 350 S.W.3d 883, 901 (Tenn. 2011). Additionally, our supreme court has determined that "statements made to a physician identifying a perpetrator who is a member of a child's household may be reasonably pertinent to proper diagnosis and treatment of emotional and psychological injury." *State v. Stinnett*, 958 S.W.2d 329, 333 (Tenn. 1997) (quoting *State v. Livingston*, 907 S.W.2d 392, 397 (Tenn. 1995)). Here, Ms. Donnell testified that she was conducting a medical evaluation not an investigation. Her questions about the nature of the injury and the circumstances under which it was caused were intended to elicit information that any physician would utilize in diagnosing and treating injuries to a child. Similarly, the statements made by the victim's mother describing the victim's injuries and the steps taken to provide treatment prior to hospitalization were relevant to diagnosis and treatment. The trial court did not err by admitting testimony about the statements made regarding the victim's injuries. Defendant is not entitled to relief on this issue.

(Doc. No. 10-13 at 11–13.)

In his brief on direct appeal, the petitioner asserted this issue solely as an error in admitting hearsay in violation of the Tennessee Rules of Evidence and state court opinions applying those rules. (Doc. No. 10-10 at 47–49.)  He acknowledged that his case did not involve a violation of his constitutional right to confront witnesses (*id.* at 49 n. 18) and did not otherwise reference the constitution or any constitutional rights in the relevant portion of his brief.  The respondent argues that to the extent the petitioner now asserts any violation of his federal constitutional rights in connection with the testimony in question, that claim was not exhausted in state court.

The court agrees.  For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (internal citation omitted).  The claim must be presented to the state courts as a federal constitutional issue, not merely as an issue arising under state law. *Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir. 1984). Specifically, in determining whether a petitioner "fairly presented" a federal

constitutional claim to the state courts, federal courts should consider whether the petitioner: (1) phrased the federal claim in terms of the pertinent constitutional law or in terms sufficiently particular to allege a denial of the specific constitutional right in question; (2) relied upon federal cases employing the constitutional analysis in question; (3) relied upon state cases employing the federal constitutional analysis in question; or (4) alleged "facts well within the mainstream of [the pertinent] constitutional law." *Hicks v. Straub*, 377 F.3d 538, 553 (6th Cir. 2004) (quoting *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). Moreover, the claim must be presented to the state courts under the same legal theory with which it is later presented in federal court. *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). Its presentation in federal court cannot rest on a legal theory that is separate and distinct from the one previously considered and rejected in state court. *Id.* This does not mean that the petitioner must recite "chapter and verse" of constitutional law, but he is required to make a specific showing of the alleged claim to the state courts. *Wagner*, 581 F.3d at 414.

The petitioner did not assert any federal rights in connection with his hearsay challenge in state court. Any such challenge is now barred from presentation to the state courts by Tennessee law for the reasons explained above. Accordingly, any federal claim raised based on the admission of hearsay testimony is procedurally defaulted and not subject to federal habeas review.

## C. Plumbing Expert

The petitioner claims that trial counsel was ineffective for failing to call an expert in the field of plumbing "to educate the jury in establishing reliable, critical evidence and the elements of my particular defense relating to hot water temperature codes, the optimum water temperature for hot water heaters, how water-heaters should be installed with a Temperature Limiting

Device, and whether the water-heater in question was properly equipped with such a device."
(Doc. No. 1 at 18.)

All federal claims of ineffective assistance of counsel are subject to the highly deferential two-prong standard of *Strickland v. Washington*, which asks: (1) whether counsel was deficient in representing the defendant; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive the defendant of a fair trial. 466 U.S. 668, 687 (1984). To meet the first prong, a petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness," and must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" *Id.* at 688–89. The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). Prejudice, under *Strickland*, requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The Tennessee Court of Criminal Appeals accurately summarized this standard on post-conviction appeal. (Doc. No. 10-24 at 9.) It summarized the relevant testimony from the post-conviction hearing and rejected the petitioner's claim on the merits:

> At the post-conviction hearing, trial counsel testified that he represented the Petitioner in criminal court, that he met with the Petitioner approximately twelve times at the jail before the trial, and that each meeting lasted approximately one hour. Counsel said that a portion of the defense was that an error could have occurred in the water heater, causing the temperature to spike or to have "bursts of hot water." Counsel agreed that the investigating officer's thermometer showed

18

readings of 129 and 131 degrees and showed spikes in the temperature at 141. Counsel said that he researched topics such as burn safety and information, how fast burns occurred, scald burns, hot water problems, and public safety announcements about how to maintain water heater temperatures and what temperatures were safe. He said that a recommendation for water heaters was to have a thermostatic mixer valve installed to balance the water temperature and to prevent temperature spikes. Counsel said that the investigating officer was not an expert witness in plumbing or water heaters.

Trial counsel testified that he consulted Dr. Foley about the victim's burns and that although Dr. Foley did not charge for the consultation, Dr. Foley provided information about how to approach the topic of burns, directed counsel to websites with helpful information, and provided information about problems with hot water. Counsel recalled reviewing medical journal articles about children and burns and reviewing public health information addressing water heater safety, including how to set the temperature on a water heater and how to prevent temperature spikes. Counsel's file contained some of the articles he reviewed, but he noted that the file did not contain all of his research.

Trial counsel testified that he did not present a medical expert, although he and the nurse practitioner who testified at the trial disagreed about whether the victim's burns could have occurred in a few seconds or minutes. Counsel said that initially the nurse practitioner believed the burns took minutes to occur, although the literature counsel had reviewed discussed the burn rate on the hands in terms of seconds. Counsel said, though, that the nurse practitioner later agreed with counsel that the burns occurred in seconds.

Trial counsel testified that the investigating officer measured the water temperature from the faucet using digital and analog thermometers, that the temperature readings ranged from 129 to 131 degrees with a spike of 141 degrees, and that the recommended water temperature was around 120 degrees, which was significantly lower than the temperature readings from the faucet. Counsel did not recall showing this information at the trial. Counsel said that "in hindsight" an expert could have established the average water temperature coming from the faucet, whether the water temperature was normal or an aberration, and whether a thermostatic mixer valve was installed on the water heater. Counsel was unsure whether the trial court would have allowed such an expert because of the "general nature" of the information.

Trial counsel testified that he and the Petitioner discussed the information Dr. Foley provided but that he did not tell the Petitioner the defense intended to present a medical expert to testify about the victim's burns. Counsel recalled that the water heater was made by Honeywell but did not recall researching any problems associated with Honeywell water heaters. Counsel agreed that a water heater engineer was not presented at the trial.

Trial counsel testified that the Petitioner and the victim's mother, along with the victim and her brother, lived in public housing and that records showed the victim's mother had contacted the housing authority to address issues with the

water heater. Counsel said that the victim's mother confirmed at the trial that she called the housing authority about the water heater after the incident in this case. Counsel obtained maintenance records, which did not show any maintenance before the incident.

On cross-examination, trial counsel testified that the defense was accidental burns, that the parties did not dispute that the victim was burned by the water from the bathroom faucet, and that the primary issue in this case was the Petitioner's intent. Counsel recalled that the State's theory was that the Petitioner intentionally held the victim's hands under the water and that the defense's theory was that the burns occurred accidentally. Counsel agreed that although an issue existed about the temperature setting of the water heater, the victim's burns were severe and obvious. Counsel said, though, that due to the severity of the burns the water temperature and the amount of time the victim's hands were under the faucet were relevant.

Trial counsel testified that he did not present Dr. Foley as a defense expert because he thought the testimony would harm the defense. Counsel said that the decision was made after evaluating Dr. Foley's potential testimony about the victim's burns. Counsel said the defense requested that the State provide notice of whether it intended to call expert witnesses beyond the nurse practitioner who treated the victim. After reviewing the maintenance records, counsel agreed that the housing authority showed one maintenance request for the water heater after the incident in this case. Counsel recalled that the State objected on the basis of relevancy to any maintenance record outside the time frame of the incident in this case.

The Petitioner testified that although he knew trial counsel had talked to someone about this case, he did not know if counsel had secured an expert medical witness. The Petitioner denied asking counsel whether he intended to present an expert from the Occupational Safety and Health Administration (OSHA) to testify about the water heater. The Petitioner denied knowing that counsel had obtained the maintenance records from the housing authority. The Petitioner said that he had heard other tenants had complained about water heater temperatures being too high and that he asked counsel to investigate it. He said counsel should have obtained an expert to show that the victim's hands were under the water for "just a couple of seconds."

On cross-examination, the Petitioner testified that he and the victim went to the bathroom to wash her hands before eating dinner. He said that he grabbed the victim's wrists, that he held her hands under the water, that he turned around to tell his two-year-old child to sit down, and that when he turned back around, the victim said her hands hurt. He said that his hands were not under the faucet but that his "top fingers" touched the water. He denied that [he] held the victim's hands under the water and said that he was washing her hands. He said that if he had not turned around, he would have noticed the water was too hot and that he was not paying attention. He said that the victim's hands were under the water no more than five seconds and denied that her hands were under the water for thirty

to forty seconds.

The Petitioner testified that trial counsel should have presented an expert witness to show that the water temperature was too hot and that the burns occurred in a few seconds. The Petitioner agreed that he did not have expert testimony to present at the post-conviction hearing.

. . .

The Petitioner contends that the post-conviction court erred by denying relief. He argues that counsel provided ineffective assistance by failing to present an expert witness, such as a burn expert, an OSHA expert, or a water heater engineer, who could have testified about the spiking of water temperatures in an effort to explain how the victim's injuries could have occurred quickly. He asserts that such expert testimony would have shown the jury that the victim's injuries were accidental. The State responds that the post-conviction court did not err by denying relief. We agree with the State.

. . .

Trial counsel's credited testimony reflects that he consulted with a medical expert, Dr. Foley, who assisted counsel with research related to water temperature and burns. Counsel stated that although he consulted with Dr. Foley, counsel did not present medical testimony because counsel did not think Dr. Foley would have benefited the defense. Although counsel did not present expert testimony related to the water heater, counsel researched possible problems with the water heater inside the home and obtained the maintenance records.

In any event, the Petitioner did not present an expert at the post-conviction hearing. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). This court will not speculate about the potential testimony of an expert witness, and without proof of what an expert's testimony might have been, the Petitioner is unable to establish his ineffective assistance allegation. As a result, the record supports the post-conviction court's determination that counsel did not provide ineffective assistance. The Petitioner is not entitled to relief on this basis.

(Doc. No. 10-24 at 5–10.)

As discussed above, the AEDPA standard asks whether the state court's determination of an exhausted claim "involved an unreasonable application of" the law, or "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. §§ 2254(d)(1) and (2); *Williams v. Taylor*, 529 U.S. 362, 412 (2000). As the Supreme Court clarified in *Harrington v. Richter*, 562 U.S. 86 (2011),

This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different

than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Id.* at 101 (internal quotation marks and citation omitted). Accordingly, the question before this court is not whether the state court's application of *Strickland* was correct, but whether it was reasonable. *Id.* ("The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable.").

In the absence of the actual proposed testimony in question, the state court's determination that the petitioner failed to establish prejudice under *Strickland* was consistent with federal case law. *See Hutchison v. Bell*, 303 F.3d 720, 748–749 (6th Cir. 2002) (noting that "a petitioner cannot show deficient performance or prejudice resulting from a failure to investigate if the petitioner does not make some showing of what evidence counsel should have pursued and how such evidence would have been material"); *Daniels v. Sexton*, No. 2:12-CV-210, 2014 WL 940467, at *8 (E.D. Tenn. Mar. 11, 2014) ("Because petitioner did not offer the testimony of these individuals at the post-conviction hearing to show that the testimony would have redounded to the benefit of the defense, petitioner has failed to demonstrate that prejudice flowed from the absence of such trial testimony."). There was already testimony at trial that the temperature of the hot water coming from the faucet was significantly higher than recommended and had spikes of up to 21 degrees higher than recommended.[1] The petitioner did not

---

[1] The petitioner's attorney used that testimony to his advantage to argue in closing argument that the victim's injury happened very quickly:

[T]here is some facts in this case that are undisputed.

demonstrate in state court, and has not demonstrated here, that corroboration of that undisputed testimony or explanation of its mechanical cause would have materially benefited his case at trial. In fact, additional testimony to the effect that the water in the victim's apartment was consistently hotter than recommended could have simply made the petitioner's actions—turning the water to hot, not checking the water temperature with his own hands, and looking away while he held the victim's hands in the water—seem even more culpable to the jury. The state courts thus reasonably concluded that the petitioner failed to establish that his vaguely proposed testimony would have worked to his advantage.

The petitioner argues in his reply that he should prevail on this claim without regard to whether he was actually prejudiced by counsel's failure because he suffered a per se violation of his right to counsel as set forth in *United States v. Cronic*, 466 U.S. 648 (1984). (Doc. No. 15 at 1–3.) Such an automatic violation is found where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," but for that to occur, "the attorney's failure must be complete." *Bell v. Cone*, 535 U.S. 685, 695–98 (2002). *Cronic* simply does not apply in circumstances where defense counsel has performed substantial work in support of a petitioner's defense at trial, as is apparent from the record in this case. *See Bell*, 535 U.S. at 695–98 (counsel had not entirely failed where he performed beneficial work at every stage of trial). The state courts reviewing the petitioner's ineffective-assistance claim were entitled to credit counsel's

---

Fact, that water is hot. It's 141.7 degrees. That is 21 degrees higher than the recommendation from manufacturers to set water heaters. It is hot water. . . . Hot water is dangerous to kids and this water is very very very hot, 112 to 114 it burns, it causes pain, this is 141 degree water.

. . . [T]his from the proof happened quickly and when water is 141 degrees or can get that hot, you know what, burns can happen quickly, a second for a full thickness burn, that is a third degree burn in approximately a second . . . that is one second for a third degree burn and less for what [the victim] had a second degree or partial thickness burn.

(Doc. No. 10-4 at 97–98.)

testimony to the effect that he did significant research into water safety issues in general and the records pertaining to the water heater in the victim's home before determining that additional evidence on those matters would not benefit the defense. "Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment." *Strickland*, 466 U.S. at 681.

The state court's rejection of the petitioner's claim was reasonable,[2] and he is not entitled to relief on this claim.

**D.    Constructive Amendment**

This claim focuses on the petitioner's disapproval of the following statements by the prosecutor during closing argument, which he says concerns "evidence clearly outside the record concerning the nature of burn cases":

> Burn cases by their nature are a different entity, in order to create a burn that is done abusively you have to stage your crime. Sometimes we fill up basins of water with hot water and we dip kids in, sometimes we take a lighter and we light the tip and we put it on the skin, or we light a cigarette and we put it on the skin, or we heat up an iron and we put it on the skin, but every one of those acts has at least two different stages, you have got to create the environment and then you have to apply the environment to the child.
>
> It is a two-step process and that conduct beyond anything in a burn case is what should tell you that this is not only not an accident, it is abuse, it is neglect, and it was knowingly engaged and indeed intentionally engaged in by Mr. Pewitte.

(Doc. No. 1 at 18–19 (quoting Doc. No. 10-4 at 90).) The petitioner asserts that this argument constituted prosecutorial misconduct and somehow constructively amended his indictment by modifying its essential terms. (Doc. No. 1 at 18–20.)

---

[2] Because this claim was raised in state court and rejected there on its merits, this court has considered it under Section 2254(d) rather than rejecting it as procedurally defaulted. Accordingly, the petitioner's reliance in his reply on *Martinez v. Ryan*, 566 U.S. 1 (2012), and its progeny "to establish cause to excuse the procedural default of [his] substantial claim of ineffective assistance at trial" (Doc. No. 15 at 3) is superfluous and has no bearing on the court's treatment of this claim.

The petitioner did not argue on direct appeal or post-conviction appeal that there had been any constructive amendment of his indictment. (*See* Doc. No. 10-10 at 11; Doc. No. 10-22.) As explained above, state law prevents the petitioner from raising that argument before the state courts at this stage. Accordingly, that portion of his claim is procedurally defaulted and not subject to federal habeas review.

The petitioner did, however, exhaust a claim on direct appeal that prosecutorial misconduct in the form of improper argument during closing should have resulted in a mistrial. (Doc. No. 10-10 at 11, 50–59.) Among other things, he complained specifically about the prosecutor's "comments concerning the nature of burn cases," which fell "outside of the evidence presented at trial" and amounted to the prosecutor's "own expert testimony on the inferences that can be drawn from burn injuries." (*Id.* at 53–54.) He characterized the portion of the argument in question as "graphic and inflammatory." (*Id.* at 54.) The Tennessee Court of Criminal Appeals rejected that claim on its merits:

> Defendant argues that the trial court erred by failing to grant a mistrial based on inappropriate closing argument by the prosecutor. The State responds that no prosecutorial misconduct occurred.
>
> A trial court has the authority to declare a mistrial, and its decision is reviewed for an abuse of discretion. *See State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009). "Normally, a mistrial should be declared only if there is a manifest necessity for such action." *State v. Saylor*, 117 S.W.3d 239 (Tenn. 2003). A mistrial is appropriate when "a trial cannot continue, or a miscarriage of justice would result if it did." *Id.* (internal quotation omitted).
>
> Closing argument is "a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001); *see State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001); *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998). Closing arguments "have special importance in the adversarial process," allowing the parties "to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008). Attorneys "should be given great latitude in both the style and the substance of their arguments." *Id.* at 131. "[A] prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." *Id.* Although not exhaustive, this Court has

25

recognized five general areas of prosecutorial misconduct during closing arguments: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or evidence or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused; (5) arguing or referring to facts outside the record unless the facts are matters of common public knowledge. *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

A trial court has significant discretion in controlling closing argument, and its decisions relative to the contents of argument may only be reversed upon an abuse of discretion. *Terry*, 46 S.W.3d at 156; *State v. Trusty*, 326 S.W.3d 582, 607 (Tenn. Crim. App. 2010). "A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *Banks*, 271 S.W.3d at 131. Instead, "an improper closing argument will not constitute reversible error unless it is so inflammatory or improper that it affected the outcome of the trial to the defendant's prejudice." *Id.* In reviewing the propriety of a prosecutor's closing argument, this Court considers:

> (1) the conduct at issue in light of the facts and circumstances of the case, (2) the curative measures undertaken by the trial court and the prosecution, (3) the intent of the prosecutor in making the improper argument, (4) the cumulative effect of the improper argument and any other errors in the record, and (5) the relative strengths and weaknesses of the case.

*Id.*; *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

. . .

Defendant next complains about the prosecutor's references to child abuse cases in general. The prosecutor argued that cases involving burns always occur in "a two-step process" involving a preparatory step and then an execution step. The prosecutor then suggested that the preparatory step in such cases is evidence of the accused's guilty state of mind. While making this argument, the prosecutor referred to other instrumentalities that are commonly involved in burn cases, such as hot water, a lighter, a cigarette, and an iron. Defendant maintains that the prosecutor was arguing evidence outside of the record by making these references. However, we do not think that is an accurate characterization of that argument. The prosecutor never asserted or suggested that any of those other hypotheticals occurred in this case. Instead, he was merely using examples of other types of conduct to help the jury understand the State's theory of the case—that Defendant intended to harm the victim and "staged" his crime by turning the water faucet from cold to hot. While we take no position on the efficacy of such an argument, we cannot say that the prosecutor's comments amounted to inappropriately arguing evidence outside of the record.

(Doc. No. 10-13 at 13–15.)

The United States Supreme Court has stated that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935). But the standard for granting habeas corpus relief on the basis of improper prosecutorial argument is extremely high. "The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citations and internal quotation marks omitted) (denying relief on the basis of inflammatory prosecutorial argument). This is particularly true when a federal court reviews a case on habeas corpus, where the scope of review is "the narrow one of due process, and not the broad exercise of supervisory power." *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). To require reversal, a prosecutor's misconduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial or so gross as probably to prejudice the defendant." *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005) (quoting *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997)).

The Sixth Circuit has instructed that in order to obtain relief on a claim of prosecutorial misconduct, a petitioner "must demonstrate that the prosecution's conduct was both improper and so flagrant as to warrant reversal." *Id.* Accordingly, if a court first finds improper conduct, it must then consider four factors to determine whether the challenged conduct is flagrant: "(1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the petitioner; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant." *Id.* Finally, in considering whether prosecutorial misconduct warrants a writ of habeas corpus, courts must find the misconduct to be harmless unless it "had a substantial and injurious effect or influence in determining the jury's verdict." *Id.* (quoting *Brecht v.*

*Abrahamson*, 507 U.S. 619, 638 (1993)); *accord Moore v. Mitchell*, 708 F.3d 760, 799–800 (6th Cir. 2013).

The standard applied by the state court is consistent with this federal standard,[3] and the state court found that the portion of the argument in question was not improper. That determination was not unreasonable. By giving commonsense examples of other similar crimes, the prosecutor did not assert or even imply that the petitioner was charged with or had committed those crimes. He did not, as the petitioner argues, misstate the evidence or mislead the jury about the facts of the case, and he did not incorporate graphic or inflammatory descriptions of hypothetical injuries that might have aroused any prejudice in the jury. He simply used analogies to frame the jury's perspective on the petitioner's crime, which is not objectively improper. *See Glenn v. Prelesnik*, No. 1:08-CV-1002, 2012 WL 4464296, at *15 (W.D. Mich. Feb. 14, 2012), *report and recommendation adopted*, No. 1:08-CV-1002, 2012 WL 4464244 (W.D. Mich. Sept. 26, 2012) (denying habeas relief because "the prosecutor's analogies served a legitimate function in these proceedings" and were "not improper"). Even if other courts might have found this particular argument improper, such a conclusion is not "beyond any possibility for fairminded disagreement," as required to warrant relief under AEDPA. *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Accordingly, the petitioner is not entitled to relief on this claim.

---

[3] The fact that the state court did not cite federal law in its opinion is immaterial to whether its decision was contrary to or an unreasonable application of clearly established federal law. *See Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding these pitfalls does not require citation of our cases-indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").

**E.     Cumulative Error**

Finally, the petitioner asserts that the cumulative effect of the errors at trial denied him a fair trial. (Doc. No. 1 at 20.)  But "[t]he law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue." *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006).   Accordingly, the petitioner is not entitled to relief on this claim.

## V.     CONCLUSION

For the foregoing reasons, the petitioner is not entitled to relief on any of his claims.  The court will deny the requested relief and dismiss the petition.

An appropriate order shall enter.

ALETA A. TRAUGER
United States District Judge

29